IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

BETTY BOULER,                              :

    Plaintiff,                         :

vs.                                        :            CA 14-0146-C

CAROLYN W. COLVIN,                         :
Acting Commissioner of Social Security,
                                           :
    Defendant.

MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §1383(c)(3), seeking judicial

review of a final decision of the Commissioner of Social Security denying her claim for

supplemental security income benefits. The parties have consented to the exercise of

jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings

in this Court. (Docs. 18 & 20 ("In accordance with the provisions of 28 U.S.C. 636(c) and

Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge

conduct any and all proceedings in this case, . . . order the entry of a final judgment, and

conduct all post-judgment proceedings.").) Upon consideration of the administrative

record, plaintiff's brief, the Commissioner's brief, and the arguments of counsel at the

February 20, 2015 hearing before the Court, it is determined that the Commissioner's

decision denying benefits should be affirmed.[1]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall
be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 18 & 20 ("An appeal from a
judgment entered by a Magistrate Judge shall be taken directly to the United States Court of
Appeals for this judicial circuit in the same manner as an appeal from any other judgment of
this district court."))

Plaintiff alleges disability due to mild mental retardation, degenerative disc disease of the low back, obesity, and problems with her hands and feet. The Administrative Law Judge (ALJ) made the following relevant findings:

> **1.      The claimant has not engaged in substantial gainful activity since March 22, 2011, the application date (20 CFR 416.971 *et seq.*).**
>
> **2.      The claimant has the following severe impairments: degenerative disk disease with low back pain, problems with her feet and hands, obesity and mild mental retardation. She also has depression that I find is non-severe (20 CFR 416.920(c)).**
>
> **3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**
>
> Under the third step, a determination must be made as to whether or not the impairment or impairments are of listing severity. The Medical Listings (20 C.F.R. Part 404, Appendix 1, Subpart P) outline the findings which must be present under each of the body systems for an impairment to be found disabling. No medical expert has concluded that the claimant's impairments meet or equal a listed impairment.
>
> .      .      .
>
> The severity of the claimant's mental impairment does not meet or medically equal the criteria of listing . . . 12.05 for mental retardation.
>
> .      .      .
>
> Medical Listing 12.00A provides in pertinent part that the structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find

that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

**4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). The claimant is able to toe walk but not able to heel walk. She ambulates without any difficulty. She is able to bend and touch her toes. She is able to squat and stand without difficulty. The claimant had the ability to understand, remember and carry out very short and simple instructions and could attend for two hour[] intervals. Contact with the general public should be infrequent and casual and not a usual part of the job. Changes to the work setting should be minimal and well structured. The claimant might need assistance with plans and goals that go beyond the simple and repetitive ones[.]**

.     .     .

At the hearing, the claimant testified she was unable to work due to both mental and physical limitations. She contends she was in special education classes in school and repeated tenth grade. She has a driver's license but had to take the test five times and was given the oral examination. She has a checking account and is able to add and subtract.

.     .     .

School records were submitted indicating that the claimant was in special education classes for grades 10 and 11 for English and reading. In the first semester of the eleventh grade, her grades were English/reading—B; American History—B; Typing—D and math—B.

.     .     .

Ms. Bouler completed a Function Report—Adult in April 2011. On this form, she indicated she would spend her day bathing, making her bed, washing clothes, cooking, eating, watching television, cleaning and walking around outside in the yard. She stated she takes care of two other[] persons with washing and cooking but has no pets. She noted no problems with personal care and stated she needed no reminders for personal needs or grooming but needed to be reminded to take her medicine.  She stated she prepares complete meals daily that take two hours. She listed house work and yard work that she does as cleaning, laundry and cooking but no yard work. She stated she cleans three times [a] week and does laundry one time a week. She needs encouragement to do these things when she is bending low and cleaning. She is able to go outside three times a week. She is able to drive and she is able to go out

3

alone. She is able to shop for food, household goods and school clothes. She is able to shop about once a month for three hours. Ms. Bouler admitted that she was able to pay bills, count change and handle a savings account but did not have a checkbook. She listed her hobbies as watching television and does this daily. She stated she does not spend time with others and goes to the store on a regular basis. She does not need to be reminded to go [] places but sometimes needs to be accompanied. She has problems getting along with family and friends and snaps a lot. She identified problems as lifting, squatting, bending, standing, walking, kneeling, stair climbing, memory, completing tasks, concentration[,] understanding, following instructions, using hands and getting along with others. . . . She has trouble concentrating and is depressed all the time. . . . She is not able to pay attention very long and does not always finish what she starts. She does not follow written or spoken instructions very well. She gets along with authority figures pretty well and has never been fired from a job because of problems getting along. She does not handle stress or changes in a routine very well.

.   .   .

On May 31, 2011, the claimant underwent a comprehensive mental status evaluation conducted by Dr. Nina Tocci, licensed psychologist, at the request of the Agency. The diagnostic impressions were malingering and she was assigned a Global Assessment of Functioning of 65 indicating only mild symptoms. Dr. Tocci administered the WAIS-IV intelligence test and the claimant obtained a full-scale IQ score of 50. The examiner opined the results of the administration of the WAIS-IV were considered invalid because of poor effort evinced by the claimant. Throughout the test, Ms. Bouler argued with modeled responses and forgot directions. Dr. Tocci summarized that the claimant[] did not appear to offer her best effort and some of her responses appeared contrived. She reported the results of testing were not a valid estimation of her ability and noted that the claimant was in the special education curriculum but dropped out of school in the eleventh grade and worked briefly at two jobs. Dr. Tocci stated if the claimant was to be re-assessed, she needed to be fully cooperative with the process.

On August 10, 2011, the claimant underwent another mental status evaluation performed by Dr. Donald W. Blanton, licensed professional counselor, at the request of the Agency. His diagnostic impressions were dysthymic disorder, pain disorder with depression, mild mental retardation and he assigned a Global Assessment of Functioning of 50 indicating serious symptoms. On the WAIS-IV adult intelligence [s]cale, Ms. Bouler obtained a full-scale IQ score of 61. Dr. Blanton opined the claimant scored in the mild range of mental retardation on this administration of the WAIS-IV. It was felt to be a valid assessment of her current level o[f] intellectual functioning, as there were no distracting factors during the testing session. The claimant appeared to put good effort into her work. He noted she appeared to have long-term problems

4

with depression worsened by chronic pain. On mental status examination, he noted her thoughts and conversation were simple but logical with associations intact. He affect was flat but appropriate and no confusion was noted. She complained of anxiety and appeared tense. Her mood was depressed and she cried often. . . . Her insight was limited and judgment considered fair for work and financial decisions.

DDS mental health expert[] Dr. Donald Hinton found that the claimant had a mild limitation in the restriction of daily living; moderate difficulties in maintain[ing] social functioning and moderate difficulties in maintaining concentration, persistence or pace. He noted she was likely to experience no episodes of decompensation. Dr. Hinton indicated the claimant had mild mental retardation but stated she was able to care for her personal needs, prepare complete meals and perform most household chores without assistance. He indicated she was able to drive and shopped as needed. She watched television in her spare time and socialized with others. She reported a short attention span and some difficulty with written and spoken instructions. She reported she was unable to handle stress or changes to her routine. He noted she was able to complete all forms in the file. He found that with treatment and treatment compliance, significant improvement would be expected in her mental health.

Dr. Hinton found that the claimant had the ability to understand, remember and carry out very short and simple instructions and could attend for two hour[] intervals. He noted contact with the general public should be infrequent and casual and not a usual part of the job. He noted changes to the work setting should be minimal and well structured. He stated the claimant might need assistance with plans and goals that go beyond the simple and repetitive ones.

The claimant began treatment with the West Alabama Mental Health Center in September 2011. The claimant was seen on September 23, 2011 for therapy. The therapist noted the claimant had anger outburst[s] and reported being aggravated with accomplishing a task. On December 1, the claimant was administratively removed from the program because of no contact since September 23 and three missed scheduled appointments.

.     .     .

In terms of the claimant's alleged mental condition, I find that the claimant has mild mental retardation and was in special education classes in two grades while in school. Results of the first consultative examination performed by Dr. Tocci at Exhibit 4F indicated that the claimant was malingering and did not put forth good effort on the intelligence testing. She obtained a full-scale IQ of 50 that Dr. Tocci opined was not valid. Dr. Tocci estimated her intellectual functioning within the low average range of intellectual ability. The examiner noted the claimant did not appear to put forth her best effort and some of her responses appeared contrived.

The Agency scheduled a second consultative psychological evaluation that was performed by Dr. Donald Blanton at Exhibit 5F. Dr. Blanton administered the WAIS-IV intelligence test and the claimant obtained a full-scale IQ score of 61 placing her in the mild range of mental retardation. He noted the scores were valid as there were no distracting factors during the testing and the claimant appeared to put good effort into her work. On mental status examination, Dr. Blanton indicated the claimant arrived on time. Her thoughts and conversation were simple but logical and associations were intact. Her affect was flat but appropriate and no psychomotor retardation or agitation was noted. Her insight was limited and judgment was considered fair for work and financial type decisions.

As earlier discussed, the diagnostic description for mental retardation reads[:] "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." It is noted that the claimant's full scale IQ of 61 would satisfy the first element in the introductory paragraph. However, element two then requires deficits in adaptive functioning which is met as long as there are significant limitations in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. Here the evidence[,] as discussed above[,] does not support deficits. The claimant is able to communicate effectively, she is able to care for her personal needs  without assistance and is able to drive and shop. Ms. Bouler testified that she is able to perform simple math and is able to pay bills and count change. She is able to handle a savings account. School records indicated that the claimant was in special education classes for the tenth and eleventh grades but her grades were mostly Bs and Cs. Relevant to the other areas of adaptive functioning, Ms. Bouler stated she cares for her personal needs independently and cares for two others. Further, she performs activities of daily living[,] including household chores of cleaning, washing dishes, laundry and cooking. These activities fail to demonstrate the deficits in adaptive functioning as required by the core elements of mental retardation. I find that the above evidence does not substantiate the level of limitation as alleged by the claimant.

I find the assessments of the DDS mental health expert to be persuasive and consistent with the other medical evidence of record. He noted the claimant was capable of work with the ability to understand, remember and carry out very short and simple instructions. He noted she could attend for two hour[] intervals. He also noted contact with the general public should not be a usual part of her job and work changes would be minimal and well structured. I agree with the assessment of Dr. Hinton and find that the claimant is capable of unskilled work activity.

.     .     .

Although the claimant has no past relevant work, she testified at the hearing that she stopped working because of problems with her feet and back and not because of any mental limitations.

.     .     .

**5.      The claimant has no past relevant work (20 CFR 416.965).**

.     .     .

**6.      The claimant was born on February 4, 1967 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).**

**8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).**

.     .     .

If the claimant had the residual functional capacity to perform the full range of light work, a finding of not disabled would be directed by Medical-Vocational Rule 202.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as cleaner (DOT 333.687-014) that she graded as light and unskilled; assembler (DOT 706.687-010) that she graded as light and unskilled[;] and bagger (DOT 920.687-018) that she graded as light and unskilled. Ms. Schulman further testified that statewide there were approximately 4,000 jobs as cleaner; 3,000 jobs as assembler[;] and 3,500 jobs as bagger. She added nationally there were approximately 366,000 jobs as cleaner; 155,000 jobs as assembler[;] and 311,000 jobs as bagger.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of not disabled is therefore appropriate under the framework of the above-cited rule.

**10.     The claimant has not been under a disability, as defined in the Social Security Act, since March 22, 2011, the date the application was filed (20 CFR 416.920(g)).**

(Tr. 15, 16, 17, 18, 19, 19-20,20, 22, 23 & 24 (internal citations and most quotation marks omitted; emphasis in original).)  The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and, thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

A claimant is entitled to an award of supplemental security income benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a) (2014). In determining whether a claimant has met her burden of proving disability, the Commissioner follows a five-step sequential evaluation process. *See* 20 C.F.R. § 416.920. At step one, if a claimant is performing substantial gainful activity, she is not disabled. 20 C.F.R. § 416.920(b). At the second step, if a claimant does not have an impairment or combination of impairments that significantly limits her physical or mental ability to do basic work activities (that is, a severe impairment), she is not disabled. 20 C.F.R. § 416.920(c). At step three, if a claimant proves that her impairments meet or medically equal one of the listed impairments set forth in Appendix 1 to Subpart P of Part 404, the

claimant will be considered disabled without consideration of age, education and work experience. 20 C.F.R. § 416.920(d). At the fourth step, if the claimant is unable to prove the existence of a listed impairment, she must prove that her physical and/or mental impairments prevent her from performing her past relevant work. 20 C.F.R. § 416.920(f). And at the fifth step, the Commissioner must consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. 20 C.F.R. § 416.920(g). Plaintiff bears the burden of proof through the first four steps of the sequential evaluation process, *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987), and while the burden of proof shifts to the Commissioner at the fifth step of the process to establish other jobs existing in substantial numbers in the national economy that the claimant can perform,[2] the ultimate burden of proving disability never shifts from the plaintiff, *see, e.g., Green v. Social Security Administration*, 223 Fed.Appx. 915, 923 (11th Cir. May 2, 2007) ("If a claimant proves that she is unable to perform her past relevant work, in the fifth step, 'the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is able to perform.' . . . Should the Commissioner 'demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled.'").[3]

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she is capable of performing those

---

[2]     *See, e.g., McManus v. Barnhart*, 2004 WL 3316303, *2 (M.D. Fla. Dec. 14, 2004) ("The burden [] temporarily shifts to the Commissioner to demonstrate that 'other work' which the claimant can perform currently exists in the national economy.").

[3]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

light jobs identified by the vocational expert, is supported by substantial evidence.
Substantial evidence is defined as more than a scintilla and means such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion.
*Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  "In determining
whether substantial evidence exists, we must view the record as a whole, taking into
account evidence favorable as well as unfavorable to the Commissioner's] decision."
*Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[4] Courts are precluded, however,
from "deciding the facts anew or re-weighing the evidence."  *Davison v. Astrue*, 370 Fed.
Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d
1206, 1210 (11th Cir. 2005)). And, "[e]ven if the evidence preponderates against the
Commissioner's findings, [a court] must affirm if the decision reached is supported by
substantial evidence." *Id.*, citing *Crawford v. Commissioner of Social Security*, 363 F.3d
1155, 1158-1159 (11th Cir. 2004).

On appeal to this Court, Bouler contends that the ALJ erred in finding that she
does not have the diagnostic features of mild mental retardation and, consequently,
erred in finding that she does not meet Listing 12.05C. (*See* Doc. 12, at 1; *see also id.* at 1-
6.)  Thus, given the nature of plaintiff's arguments, this case is solely a step three case.
*See* 20 C.F.R. § 416.920(d) ("If you have an impairment(s) which meets the duration
requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will
find you disabled without considering your age, education, and work experience.").

In this circuit, Bouler bears the burden of proving that she has an impairment
which meets or is medically equivalent to a listed impairment. *Frame v. Commissioner*,
*Social Security Administration,* 2015 WL 150733, *2 (11th Cir. Jan. 13, 2015) ("To prevail at

---

[4]     This Court's review of the Commissioner's application of legal principles,
however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

step three, the claimant must provide specific evidence—such as medical signs, symptoms, or laboratory-test results—showing that her impairment meets or medically equals a listed impairment. *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990). 'For a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"). Once an impairment is shown to meet or medically equal a listed impairment, a claimant is "conclusively presumed to be disabled based on . . . her medical condition." *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997).

To establish presumptive disability under §12.05C, a claimant must present evidence of "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05C. In addition, while plaintiff must "also satisfy the 'diagnostic description' of mental retardation in Listing 12.05[,]"*Cooper v. Commissioner of Social Security*, 217 Fed.Appx. 450, 452, 2007 WL 543059, *1 (6th Cir. Feb. 15, 2007), citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001), the law in this circuit is clear that where, as here, a claimant has presented a valid IQ score of 60 to 70, she is entitled to the presumption that she manifested deficits in adaptive functioning before the age of 22, *Hodges v. Barnhart*, 276 F.3d 1265, 1266 & 1268-1269 (11th Cir. 2001).[5] Indeed, the Eleventh Circuit has concisely set forth what a claimant must prove in order to establish that she meets Listing 12.05 ("intellectual

---

[5]     This presumption is rebuttable, the Commissioner being charged with the task of determining whether there is sufficient evidence (relating to plaintiff's daily life) to rebut the presumption. *Grant v. Astrue*, 255 Fed.Appx. 374, 375 (11th Cir. Nov. 13, 2007).

disability"[6]), and more specifically Listing 12.05C, in a recent, albeit unpublished,

decision. *See Frame, supra,* at *2-3.

> To meet listing 12.05 . . ., "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton,* 120 F.3d at 1219.[7] These requirements are referred to as the listing's "diagnostic criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description for [intellectual disability].") In addition to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing. *See id.* § 12.05. Under paragraph C, the only paragraph at issue here, a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

---

[6]    "Effective September 3, 2013, the Social Security Administration replaced the term *mental retardation* with the term *intellectual disability* as a listed impairment. This change was made because 'the term "mental retardation" has negative connotations,' and 'has become offensive to many people.' But this change 'd[id] not affect the actual medical definition of the disorder or available programs or services.'" *Frame, supra,* at *2 n.2 (internal citations omitted). Because the ALJ's decision issued before the change took effect (Tr. 24 (decision issued on November 13, 2012)), and the parties have made use of the old terminology, this Court will likewise utilize the old terminology. *See Hickel v. Commissioner of Social Security,* 539 Fed.Appx. 980, 982 n.2 (11th Cir. Oct. 28, 2013) ("Because the amendment does not effect a substantive change, and to avoid confusion, this opinion uses the term 'mental retardation' used by the parties and the ALJ.").

[7]    "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. "'Adaptive functioning' refers to a person's ability to perform activities of daily living and social functioning." *Fischer v. Barnhart,* 129 Fed.Appx. 297, 301-302, 2005 WL 352451, *4 (7th Cir. Feb. 11, 2005) (citation omitted); *see also Hickel, supra,* 539 Fed.Appx. at 983 n.4 ("The Social Security Administration's Program Operations Manual System [] states that the phrase 'adaptive functioning' refers to 'the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age.' Similarly, the American Psychiatric Association states that the phrase refers to how effectively an individual copes with the common demands of life and how well the individual meets the standards for personal independence of someone in her particular age group, sociocultural background, and community setting." (internal citations omitted)); *Harper v. Colvin,* 2014 WL 3733119, *6 (N.D. Ala. Jul. 25, 2014) ("'[A]daptive activities' include 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'").

A *valid* IQ score of 60 to 70 satisfies the first prong of paragraph C and creates a rebuttable presumption that the claimant satisfies the diagnostic criteria for intellectual disability. *See Hodges v. Barnhart,* 276 F.3d 1265, 1268-69 (11th Cir. 2001). At the same time, it is well established that such a presumption does not arise where a qualifying IQ score is inconsistent with other record evidence concerning her daily activities and behavior. *Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir. 1992) (citing *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986)). But once the ALJ accepts an IQ sore as valid and finds that the claimant's impairments meet or medically equal the other criteria of listing 12.05C, the disability determination cannot be based on the claimant's age, education, or work experience.

In sum, a claimant proves that she meets listing 12.05C by establishing the diagnostic criteria for intellectual disability, including deficits in adaptive functioning[8]; showing onset before age 22; producing a valid, qualifying IQ score; and exhibiting the requisite deficits in work-related functioning.

*Id.* (footnote added); *see also Lackey v. Colvin,* 2014 WL 1338104, *12 (N.D. Ala. Mar. 28, 2014) ("[W]here the claimant relies on 12.05(C), the claimant must meet the three diagnostic requirements in the introductory paragraph and *also* meet the requirements set forth in (C)." (emphasis in original)).

With these general principles in mind, the Court considers the alleged errors made by the ALJ in this case, that is, whether the ALJ erred in finding that plaintiff does not have the diagnostic features of mild mental retardation and, consequently, erred in finding that she does not meet Listing 12.05C. Initially, to the extent plaintiff means to suggest that the ALJ failed to specifically give her the benefit of the presumption recognized in *Hodges, supra,* 276 F.3d at 1266-1267 ("We agree with other circuits in concluding that there is a presumption that mental retardation is a condition that

---

[8]     "'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Tabor v. Astrue,* 2012 WL 1020432, *7 n.29 (N.D. Fla. Feb. 22, 2012) (quoting DSM-IV at 40), *report and recommendation adopted,* 2012 WL 1059089 (N.D. Fla. Mar. 27, 2012).

remains constant throughout life. Therefore, we find that a claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age of twenty-two, when she presented evidence of low IQ test results after the age of twenty-two. We reverse the district judge with directions to remand to the administrative law judge for a determination of whether there is substantial evidence to rebut this presumption of a fairly constant mental capacity before the age of twenty-two."), this Court finds no error in the ALJ's failure to make specific mention of the *Hodges* presumption inasmuch as the ALJ did not challenge the validity of Bouler's full-scale IQ score of 61 (*compare* Tr. 20 ("Ms. Bouler obtained a full-scale IQ score of 61.") *with id.* at 22 ("It is noted that the claimant's full scale IQ of 61 would satisfy the first element in the introductory paragraph[.]")). *See Garrett v. Astrue,* 244 Fed.Appx. 937, 939 (11th Cir. Jul. 3, 2007) ("It was not error for the ALJ not to mention the *Hodges* presumption because the ALJ did not challenge that Garrett's low IQ began before age twenty-two.").[9] Accordingly, the Court turns its attention to the pivotal issue in this case of whether substantial evidence in the record supports the ALJ's determination that Bouler lacked the required level of deficits in adaptive functioning to meet Listing 12.05. This is the actual proper framing of the issue inasmuch as until the requirements set forth in the introductory paragraph

---

[9]    To the further extent that plaintiff argues that "the ALJ's adoption of the severe impairment of mild mental retardation presumes the presence of adaptive deficits[]" (Doc. 12, at 3), the Court finds this position unpersuasive and untenable. *See Hickel, supra,* 539 Fed.Appx. at 982, 985 & 985 n.9 ("Here the ALJ determined at steps one and two that Hickel had not engaged in substantial gainful activity since birth and had the severe impairment of mild mental retardation. At step three, the ALJ concluded that Hickel's impairment of mild mental retardation did not meet or equal a listed impairment, specifically the mental retardation listing in [20] C.F.R. pt. 404, subpt. P, app. 1, § 12.05[.] . . . [S]ubstantial evidence supports the ALJ's finding that Hickel lacked the required level of deficits in adaptive functioning to meet Listing 12.05. [] Because substantial evidence supports the ALJ's finding that Hickel did not meet the 'deficits in adaptive functioning' requirement in § 12.05's introduction, we do not address the ALJ's alternative finding that Hickel also did not have 'a physical or other mental impairment imposing an additional and significant work-related limitation of function,' as required by paragraph C of listing 12.05.").

of § 12.05 are met, there is no need for the ALJ to discuss the specifics of paragraph C of

Listing 12.05. *Compare Hickel, supra,* 539 Fed.Appx. at 985 & n.9 *with Lackey, supra,* at *12.

In this case, the ALJ found that despite Bouler's valid full scale IQ score of 61, she

did not have "deficits in adaptive functioning" based upon the following:

> The claimant is able to communicate effectively, she is able to care for her
> personal needs  without assistance and is able to drive and shop. Ms.
> Bouler testified that she is able to perform simple math and is able to pay
> bills and count change. She is able to handle a savings account. School
> records indicated that the claimant was in special education classes for the
> tenth and eleventh grades but her grades were mostly Bs and Cs. Relevant
> to the other areas of adaptive functioning, Ms. Bouler stated she cares for
> her personal needs independently and cares for two others. Further, she
> performs activities of daily living[,] including household chores of
> cleaning, washing, laundry and cooking.

(Tr. 22.)[10] Bouler does not dispute that she can communicate effectively, drive, shop,

perform simple math, count change, pay bills, handle a savings account, cook, clean,

---

[10]    The ALJ also noted in a later paragraph that "[a]lthough the claimant has no past
relevant work, she testified at the hearing that she stopped working because of problems with
her feet and back and not because of any mental limitations." (Tr. 23.)  The Court finds this
statement relevant to plaintiff's argument in brief that the fact she had no past relevant work
and that the work she did have for short periods of time were unskilled jobs weighs in favor of
a finding of deficits in the "work" skill area (*see* Doc. 12, at 4). This Court agrees with the ALJ's
observation in this regard particularly in light of the *Hickel* court's agreement with the ALJ that
a claimant's engagement in part time work, that is, work that does not constitute substantial
gainful activity, is still relevant to the "deficits in adaptive functioning" inquiry. *See* 539
Fed.Appx. at 982 & 984. Accordingly, the undersigned finds relevant to the "deficits in adaptive
functioning" inquiry the evidence in the record which establishes that Bouler stopped working
as a packer at a poultry farm and a presser of clothes at a cleaners (*see* Tr. 124 & 137) because she
was having problems with her back and feet (Tr. 34). To be sure, plaintiff testified that she was
fired from the cleaners because she was "messing the clothes up[]" (*id.*); however, there is
nothing to indicate that her inability to iron clothes correctly was attributable to intellectual
limitations, as opposed to physical limitations, particularly in light of her later testimony that
she became unable to work in June of 2009 because of problems with her feet, back, and hands
(*id.*; *see also* Tr. 193 (Bouler reported to Dr. Nina E. Tocci that she "could not handle the standing
and ironing")). *Cf. Syler v. Colvin,* 2014 WL 1092751, *11 (S.D. Ala. Mar. 20, 2014) (finding
significant that the record contained "no allegation that Plaintiff ever quit working due to any
mental or cognitive impairment.").

wash dishes, do laundry, care for her personal needs, and take care of her children[11]. (*See* Doc. 12, at 5.) Instead, she relies upon the undersigned's decision in *Frank v. Astrue*, 2011 WL 6111692 (S.D. Ala. Dec. 8, 2011) to argue that "[t]here is no basis for [the ALJ's] belief that an individual with mental retardation should not be able to communicate, drive, shop, count change, and perform activities of daily living." (*Id.*) The undersigned finds the claimant's reliance on *Frank* to be unavailing because that case did not address the question squarely before this Court, namely, whether substantial evidence in the record supports the ALJ's determination that the claimant lacks the required level of deficits in adaptive functioning to meet Listing 12.05; instead, in *Frank,* this Court prominently noted that the ALJ did not "cite to, discuss, or otherwise reference section 12.05(C)[,]" *id.* at *4, and, thereafter, indicated—but made no final determination—that "it does not appear that the other evidence in this record—specifically, the plaintiff's daily activities and behavior—is inconsistent with her IQ testing[,]" *id.* at *6, as a prelude to remanding the case for further development of the record, *id.* at *7. Because the Eleventh Circuit case law set forth heretofore recognizes that those "matters" or "activities" cited by the ALJ, as reference above by the Court, bear directly on the question of whether Bouler has "deficits in adaptive functioning,]" *compare, e.g., Hickel, supra,* at *984 ("There is evidence in the record to support the ALJ's findings with respect to Hickel's daily activities and behavior. Hickel does not dispute that she is a high school graduate, she works part time at a nursery, she drives herself to work, she can prepare simple meals and dress and groom herself, she attends church regularly, and she socializes with friends.") *with Garrett, supra,* 244 Fed.Appx. at 939 ("The record supports the finding by the ALJ that the required limitations to adaptive functioning

---

[11]      There is evidence in the record to support these findings by the ALJ.(*See. e.g.,* Tr. 32-33, 36, 129-134, 147, 194 & 199-200.)

were not present, despite Garrett's low IQ score. Garrett is able to cook simple meals; perform chores such as dishwashing and yard work; and build model cars. Garrett's daily activities include church attendance, television viewing, card playing, and walking in the mall. Garrett also testified that, with orientation and instruction, he believed he could return to a job as a stock assistant."), this Court **REJECTS** plaintiff's contention to the contrary.

In addition to the activities and behavior cited by the ALJ (Tr. 22), the record evidence also reflects that plaintiff has friends (*compare* Tr. 36 (during her hearing testimony, plaintiff made reference to a friend named "Adonna") *with* Tr. 199 ("She has a boyfriend that she sees on the weekends. . . . She does spend some time with her sister and a cousin.")),  her daily activities include watching television and playing dominoes and other games with her children (Tr. 199-200; *see also* Tr. 133 (watching television was reported as plaintiff's sole hobby or interest)), and walking in her yard (Tr. 129).[12] Moreover, Dr. Tocci, a psychologist who administered the WAIS-IV IQ test on May 31, 2011, found plaintiff's test results invalid (Tr. 195) but estimated her functioning to be "within the low range of intellectual ability." (Tr. 194.) Finally, though Dr. Donald W. Blanton, another psychologist who administered the WAIS-IV on August 10, 2011, found plaintiff to have a valid full scale IQ of 61 (Tr. 200) and diagnosed mild mental retardation (Tr. 201), he did not specifically note any deficits in adaptive function (*see* Tr. 198-201), as he has shown himself capable of doing in other cases, *see Reed v. Colvin*, 2014 WL 2973256, *2 (N.D. Ala. Jun. 30, 2014) ("Dr. Blanton opined that claimant's mental retardation was a lifelong condition, and that claimant 'demonstrate[d] deficits in adaptive functioning due to his mental retardation manifested prior to age 22 in the

---

[12]     *See Garrett, supra*, 244 Fed.Appx. at 939 (referencing card playing and walking in the mall).

following areas: (1) Communication[;] (2) Work[;] (3) Health [and] Safety[; and] (4) Functional Academic Skills.'").

In consideration of the foregoing, this Court finds that Bouler's activities and behavior rebutted the presumption created by *Hodges* and established that plaintiff did not have "deficits in adaptive functioning[.]" (Tr. 22.) In other words, substantial evidence of record supports the ALJ's finding that Bouler lacked the required level of deficits in adaptive functioning to meet Listing 12.05. *See Bailey v. Colvin,* 2015 WL 661375, *4 (N.D. Ala. Feb. 17, 2015) (finding that the claimant did not have the necessary adaptive functioning deficits to meet Listing 12.05 where the record indicated the claimant was able "to do laundry, care for her son, watch television, drive a car, shop in stores, and care for her basic personal needs independently.").

Because Bouler raises no other error, *compare Lackey, supra,* at *11 & 13 (considering the sole error raised by the claimant of "whether the ALJ erred in finding that the claimant did not meet Listing 12.05C") *with Turman v. Colvin,* 2015 WL 500810, *4 (M.D. Ga. Feb. 5, 2015) ("Because the Court holds that the ALJ's finding that Plaintiff did not prove deficits in adaptive functioning is not reversible error, Plaintiff's other contention [that the ALJ erred with respect to the other 'physical or mental impairment' requirement of 12.05C] is moot."),[13] the Commissioner's decision must be affirmed.

## CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying

---

[13]     Indeed, counsel for plaintiff specifically stated during oral argument on February 20, 2015, that he had no "qualms" about the ALJ's RFC determination.

18

plaintiff benefits be affirmed.

      **DONE** and **ORDERED** this the 2nd day of March, 2015.

s/WILLIAM E. CASSADY

**UNITED STATES MAGISTRATE JUDGE**
